**Ricky SPENCER, 98–B–0248, Petitioner,**

v.

**Edward E. DONNELLY Superintendent, Wende Correctional Facility, Respondent.**

**No. 00–CV–0262SR.**

United States District Court, W.D. New York.

Feb. 6, 2002.

Ricky Spencer, Malone, NY, pro se.

Donna A. Milling, Erie County District Atty., Buffalo, NY, for Respondent.

### DECISION AND ORDER

SCHROEDER, United States Magistrate Judge.

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2254. (Dkt.# 7).

Petitioner seeks federal *habeas corpus* review of a judgment of conviction entered on December 22, 1997 after a non-jury trial before the Hon. Christopher J. Burns, Erie County Supreme Court convicting him of two counts of rape in the first degree and endangering the welfare of a child. The child involved was the nine (9) year old daughter of petitioner's girlfriend.

Petitioner's claims in his state court appeal included ineffective assistance of trial counsel, insufficiency of the evidence and improper admission of hearsay testimony. The New York State Supreme Court, Appellate Division, Fourth Department issued an Order and Memorandum on June 18, 1999 affirming the conviction. *People v. Spencer*, 262 A.D.2d 1062, 692 N.Y.S.2d 281. In relevant part, the court held that "[d]efendant failed to demonstrate the absence of a strategic explanation for defense counsel's failure to cross-examine the victim concerning inconsistencies in her grand jury and trial testimony" (*citing People v. Garcia*, 75 N.Y.2d 973, 974, 556 N.Y.S.2d 505, 555 N.E.2d 902) and that "[t]he evidence, the law and the circumstances of this case, 'viewed in totality and as of the time of representation, reveal that the attorney provided meaningful representation'" (*quoting People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429

David Gerald Jay, Buffalo, NY, for Petitioner.

N.E.2d 400). *Spencer,* 262 A.D.2d at 1062, 692 N.Y.S.2d 281. On November 1, 1999, the New York Court of Appeals issued a Certificate denying leave to appeal. *People v. Spencer,* 94 N.Y.2d 829, 702 N.Y.S.2d 600, 724 N.E.2d 392 (1999) (Table).

This *pro se* petition was filed on March 22, 2000 in the Western District of New York. (Dkt.# 1). Petitioner sets forth two grounds for which he claims he is entitled to *habeas corpus* relief: (1) he was denied effective assistance of trial counsel; and (2) the evidence was not legally sufficient to support a finding of guilt beyond a reasonable doubt. (Dkt.# 1). These issues have been exhausted in his state court proceedings, and this Court has jurisdiction to address them.

Respondent filed an Answer to the petition and a Memorandum of Law on May 17, 2000. (Dkt. # 5 & # 6). With respect to the ineffective assistance of counsel claim, respondent maintains that trial counsel's representation of petitioner met the standard of overall reasonableness in accordance with the requirements set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (Dkt. # 5, ¶ 4; Dkt. # 6, pp. 2–7). Petitioner's response was filed on July 11, 2000 and generally challenges the validity of respondent's position put forth in his Answer and Memorandum of Law.

This Court issued an order on April 6, 2001 directing that the record be expanded to include the grand jury testimony which was central to petitioner's ineffective assistance of counsel claim. (Dkt.# 9). The transcript was submitted to the Court under seal on April 10, 2001.[1] On May 25, 2001 David Gerald Jay, Esq. was appointed to represent petitioner (Dkt.# 12) and, after several status conferences, a *Sparman*[2] hearing was ordered and thereafter conducted on August 28, 2001. Petitioner's state court trial counsel, Anna L. Scott, Esq., testified at this hearing and was the only witness called to testify.

## BACKGROUND

During the time relevant to the state indictment, petitioner resided with his girlfriend, Michele Morgan and their two children. Ms. Morgan also had a daughter, Abeline, who, by order of Family Court, resided with her paternal grandmother. It was alleged that from approximately June 1 to December 25, 1995, petitioner sexually abused Abeline several times while she was visiting in her mother's home, and Ms. Morgan was not there.

The indictment against the petitioner charged two counts of rape in the first degree, two counts of sodomy in the first degree and one count of endangering the welfare of a child. The defendant waived his right to trial by jury, and a bench trial proceeded before the Hon. Christopher J. Burns, J.S.C., on October 28, 1997. Among those who testified at the trial were Abeline, her mother, her paternal grandmother, petitioner, Dr. Jack Coyne, the physician who examined Abeline relative to her claim of abuse, petitioner's

---

1. The grand jury testimony was actually a part of the Record on Appeal in the state court proceedings, but for some unknown reason was not included in the state court records forwarded to this Court in connection with the instant petition.

2. The Second Circuit Court of Appeals has held that "a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity *to be heard and to present* evidence, in the form of live testimony, affidavits, or briefs." *Sparman v. Edwards,* 154 F.3d 51 (2d. Cir.1998); *see also United States v. Davis,* 239 F.3d 283 (2d Cir.2001) (in a criminal appeal of defendant's conviction, an evidentiary hearing is necessary on allegations of ineffective assistance of counsel).

teenage daughter and petitioner's and Ms. Morgan's young daughter, Lydia[3]. At the close of the prosecution's case, the trial judge dismissed the sodomy counts since no evidence had been presented to establish the commission of these crimes as alleged in the indictment.

On October 31, 1997, after all the proof was completed and the parties presented final arguments, the trial judge rendered a judgment of guilty on the remaining counts of the indictment, to wit, two counts of rape in the first degree and one count of endangering the welfare of a child. On December 22, 1997, petitioner was sentenced to a minimum of 10 years and a maximum of 20 years imprisonment on each rape conviction and one year on the child endangerment conviction, all to run concurrently.

### DISCUSSION AND ANALYSIS

Petitioner alleges the following facts in support of his claim of ineffective assistance of trial counsel:

(1) trial counsel failed to impeach the complaining witness with her inconsistent grand jury testimony;[4]

(2) trial counsel offered no evidence or expert testimony to refute the prosecution's expert witness and failed to sufficiently cross-examine such witness;

(3) trial counsel failed to object to hearsay testimony by the expert witness with respect to statements made to him by the complaining witness;[5]

(4) trial counsel presented testimony of Ms. Morgan on the issue of whether petitioner was ever home alone with the children without reviewing such issue with the witness before calling her to testify. As a result, this purported supporting testimony was easily and clearly discredited during the prosecution's rebuttal proof;

(5) trial counsel failed to object to the hearsay testimony of Ms. Morgan's employer (a rebuttal witness) regarding statements made to him by Ms. Morgan;

(6) trial counsel presented two witnesses who gave clearly contradictory testimony about whether petitioner was ever alone in the home with the children;

(7) trial counsel failed to provide a meaningful summation and even intimated her own client's guilt by stating (about Ms. Morgan) "she actually believes her mate was not responsible for this act and that's going to remain with her for some time;" and

(8) trial counsel had petitioner testify about his sexual impotence without offering corroborating proof, rendering it patently unreliable.

For purposes of deciding whether the petition should be granted, I have primarily focused on two issues: (1) on trial counsel's failure to make use of the complaining witness's prior inconsistent statements and grand jury testimony in order to impeach her on the substantive issues of whether the petitioner engaged in acts of intercourse and/or oral sex with her as charged in the indictment; and (2) her failure to utilize the services of an expert medical witness. Since I consider these issues to be not only crucial but also determinative with respect to the petition herein, I find it unnecessary to address in detail the other claims relating to the charge of ineffective assistance of trial counsel.

---

3. Her testimony was unsworn because of her young age.

4. The complaining witness testified before the grand jury twice (eight days apart) and then at trial, giving three different sworn versions of what she claimed occurred and did not occur.

5. In fact, defense counsel did not interpose a single objection during the entire trial.

*The Inconsistent Prior Statements and Grand Jury Testimony of the Complaining Witness, Abeline*

Because these statements are deemed to be crucial elements in the determination of whether trial counsel was ineffective in her representation of petitioner, I have sacrificed brevity and hereby set out in detail those particular statements or testimony as part of my decision making analysis. It is emphasized that the complaining witness, Abeline, had been in psychological counseling since approximately the age of five (5) and that she had been diagnosed as suffering Oppositional Defiant Disorder with a history of **lying**, stealing, talking back and **sexual inappropriateness**. (Pt–2, pp. 135, 229, 233–236).[6]

### A. The Statements of April 18, 1996 and April 30, 1996:

On or about April 18, 1996, as a result of an interview with representatives of Mid–Erie Counseling and Treatment Services, a report was made wherein it is stated:

Child reports that while at a weekend visit to mom's house, she was witness to mom's boyfriend removing his clothing and asking her to join him in a separate room.

Client reported to PT [primary therapist] during TX [treatment] session that mother's boyfriend has HX [history] of disrobing completely in front of her while mom is at work while on weekend visits, client states that she refuses to join in a separate room where (sic) he requests.

(Pt–2, pp. 226–227, 237).

On or about April 30, 1996, she told Dr. Coyne, the examining physician:

I'm here because my sister's daddy put his **finger** and his private inside my private and my **butt** many times, he told me not to tell anyone or he'd kill me, the time was last year sometime, I can't remember exactly but it was when my mom would leave.

Pt–2, p. 237 (emphasis added).

### B. The Grand Jury Testimony:

On November 19, 1996, Abeline first appeared before an Erie County Grand Jury, and at that time, testified as follows concerning the alleged sexual assaults performed upon her by the petitioner sometime around Christmas of 1995 while her mother was at work:

A: When—well, when my sister and brother were sitting down on the floor watching TV, then he told them to go in the bedroom and go play and then he called me and then they come back out the room. Then he yelled at them. And then I don't know what to do, I was scared and I had to go and see what he wanted.

Q: Okay. Did you go over to him?

A: Yes.

Q: And what did he want?

A: He wanted to do something nasty.

Q: Okay. How do you know he wanted to do something nasty?

A: Because he told me to come here.

Q: Okay. Did he tell you to do something?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: Okay. And what was that nasty thing he told you to do?

A: **Put his private in my mouth.**

(Pt–1, pp. 12–13) (emphasis added).[7] She testified that this occurred in the living

---

6. Pt–2 refers to Petitioner's Exhibit 2, the trial transcript (marked "Plaintiff's Exhibit 2"), which was received by this Court in the *Sparman* hearing.

7. Pt–1 refers to Petitioner's Exhibit 1 (marked "Plaintiff's Exhibit 1") which was received by the Court in the *Sparman* hearing and consists of the November 19 and 27, 1996 grand

room, on the sofa while under a blanket. (Pt–1, p. 11).

During this first grand jury appearance, she also gave the following testimony:

Q: Okay. Now did—at any time did he **touch any part of you?**
A: No.
Q: Now, did he ever put his private **any place else besides in your mouth?**
A: No.
Q: Now is that the first time that he put his private in your mouth?
A: No.

(Pt–1, pp. 14–15) (emphasis added). She testified that this happened many times, both at her mother's current residence on 14th Street and when they all lived together on Davidson Street. Regarding other alleged sexual activity, she testified as follows:

Q: Now, on Davis (sic) Street, did he **ever put his private anywhere else besides in your mouth?**
A: No.

(Pt–1, p. 15) (emphasis added). This testimony was inconsistent with her allegations and statements made to Dr. Coyne on April 30, 1996 wherein she had stated that petitioner had **"put his finger and his private inside [her] private and [her] butt many times."** Abeline was called back to the grand jury eight days later at which time she testified on November 27, 1996 as follows:

Q: She's still under oath. Okay. She was qualified last time to testify. Okay. Now Abby's come in today and I asked

jury testimony of the complaining witness Abeline.

8. It is worth noting that although she claimed she was "scared" during her grand jury appearance on November 19, 1996, she apparently did not suffer such fears at the trial as evidenced by the following anecdote that took place upon completion of her trial testimony as she was leaving the witness chair when she stated: "Okay everyone, I'm Judge Judy and

if maybe there's you **forgot** to tell us something last time? (sic)
A: Yes.
Q: Okay. Did you remember that Ricky put his private someplace besides your mouth?
A: Yes.
Q: Okay. Want to tell us where? Go ahead and tell us nice and loud?
A: **His private in my private.**

\*      \*      \*      \*      \*      \*

Q: Okay. And is that the only other place he put it besides your mouth?
A: Yes.
Q: Okay. And how come you didn't tell us that the last time?
A: Because I was **scared.**[8]

(Pt–1, pp. 2–4, 2nd appear (emphasis added)).[9] She stated that this occurred a "couple" times, both during the previous summer and current school year. (Pt–1, p. 3, 2nd appear.) Although it would appear that Abeline corrected her prior grand jury testimony by this memory recall, it nevertheless appears to the Court to be in contradiction to the statement given by her to Dr. Coyne, to wit, "daddy put his **finger** and his private inside my private **and my butt many times."** (emphasis added).

### Abeline's Trial Testimony

At petitioner's trial, Abeline's testimony resulted in further substantive inconsistencies as to the alleged sexual events occur-

anybody mess with me get detention." Pt–2, p. 56

9. The transcript of the grand jury proceedings held on November 27, 1996 is attached to the end of the grand jury proceedings held on November 19, 1996 but the page numbering for the second appearance of Abeline begins anew. The total transcript for both appearances of Abeline in the grand jury amounted to less than twenty (20) pages of text.

ring during the summer of 1995 wherein she testified as follows:

A: He calls me in the [bed]room.

Q: Did he call anyone else in the room?

A: No.

\* \* \* \* \* \*

Q: After he took your clothes off, what happened? Did he touch you?

A: Yes.

Q: What did he touch you with?

**A: His hand.**

Q: And what did he do with his hands?

A: Doing bad things.

Q: Like what?

A: Nasty stuff.

**Q:. Where did his hands touch you?**

**A: On my booty.**

**Q: And anywhere else?**

**A: No.**

Q: Did you see his private parts?

A: Yes.

\* \* \* \* \* \*

Q: What did he do with it?

A: He put it in my—

Q: In your what?

A: Private.

(Pt–2, pp. 21–23) (emphasis added). She testified that this specific behavior occurred more than once during 1995 beginning with the above summer incident and continuing into the following year. She testified to only one other specific incident that she said occurred in the living room (Pt–2, pp. 24, 27 – 31), which apparently was the incident on the sofa previously described herein as part of her grand jury testimony. (Pt–1, pp. 11–13). However, in further describing the incident at trial, she described what amounted to inter-

course rather than oral sex. When asked on direct examination by the prosecutor if there were any other incidents of improper sexual contact or behavior, Abeline testified as follows:

Q: Can you remember any other times when something would happen between you and Rick?

A: No.

Q: You told us that Rick put his private part in your private part, **did Rick ever put his private part anyplace else on your body?**

**A: No.**

Q: Did he ever want you to touch him?

A: No.

**Q: Did he ever want you to put it in your mouth?**

**A: No.**

Q: Did he ever put his mouth on you?

A: No.

Pt–2, p. 26 (emphasis added).

On cross examination, defense counsel did not ask Abeline any questions about any of the aforesaid prior inconsistent statements. The only inconsistencies about which she questioned the witness were peripheral in nature and were limited to those that occurred during Abeline's *trial* testimony.[10]

### The Sparman Hearing[11]

Petitioner's trial counsel, Anna L. Scott, Esq., was called as a witness by counsel for the petitioner. She admitted that she did not utilize any of Abeline's grand jury testimony at trial. Her explanation for this is as follows. Just prior to the commencement of the trial, a decision was

---

**10.** For example, during direct examination when describing the incident in her mother's bedroom, Abeline first stated that her two younger siblings went into the bedroom with her and were allowed to remain there and watch. Pt–2, pp. 13–14. Regarding that same incident, later on in her direct testimo-

ny, she stated that Ricky yelled at her siblings to leave the room, which they did. Pt–2, p. 21.

**11.** Transcript page references for this hearing shall be preceded by "Sp".

made to waive a jury and proceed with a bench trial (Sp.9). After this waiver of a jury trial was accepted by the trial court, the prosecution provided Ms. Scott with the prior statements of its proposed witnesses pursuant to *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), *cert. denied,* 368 U.S. 866, 82 S.Ct. 117, 7 L.Ed.2d 64 and New York Criminal Procedure Law § 240.45.[12] The parties waived opening statements, Abeline was the first witness called by the prosecution, and moments before she took the stand to testify at trial, her grand jury testimony was given to Ms. Scott (Sp.11).

Ms. Scott testified that she began to review Abeline's grand jury testimony upon receiving it, but decided that it would be better to put it down and focus on the witness's trial testimony once it began (Sp.13, 26–27, 33). By the time Abeline had concluded her direct testimony, Ms. Scott had read only a small portion of the grand jury transcript, the total of which consisted of less than twenty (20) pages, and had not yet come to the parts in the transcript where Abeline testified about any of the substantive allegations relating to the petitioner's alleged conduct (Sp.34, 38). Nevertheless, counsel immediately proceeded to cross-examine the witness without first reading the witness's prior sworn testimony before the grand jury regarding the allegations that formed the basis for the criminal indictment against her client.

Simply stated, **Ms. Scott did not cross-examine Abeline about her prior inconsistent grand jury testimony because she had not completely read it.** When asked by this Court as to why she did not ask the trial judge for a short recess before commencing her cross-examination of Abeline so as to enable her to complete her review

of the witness's grand jury testimony, Ms. Scott responded as follows:

The Court: You had testified here today, Ms. Scott, that just at the start of the trial when the People called the first witness, Abeline, who was the alleged victim, you were given a copy of her Grand Jury testimony. Is that correct?

The Witness: Yes, sir.

The Court: And the Grand Jury testimony which is Petitioner's Exhibit 1 consisted of her three different appearances before the Grand Jury.

The Witness: I think there were two.

The Court: Or two different appearances before the Grand Jury. And then you testified, as I understood it, that you began reading the Grand Jury minutes that had just been given to you when Abeline started her testimony.

The Witness: Yes.

The Court: And that because you were trying to do two things at the same time, you were not fully comprehending either what Abeline was saying on the stand or what you were reading in the Grand Jury minutes. Is that correct?

The Witness: No. I think what I did was to decide that hearing her overrided (sic) continuing to read the Grand Jury minutes at the time.

The Court: So you stopped reading the Grand Jury minutes?

The Witness: Yes.

The Court: So you could listen to her testimony?

The Witness: Yes.

The Court: After she finished her testimony on direct, this is Abeline, did you ask Judge Burns for a recess so that you could review the Grand Jury minutes?

**12.** Surprisingly, when asked Ms. Scott indicated that she "was not familiar with" *People v. Rosario* which is considered to be a funda-

mental cornerstone of New York criminal trial practice (Sp.10, 11).

The Witness: No, I didn't.

The Court: Why—

The Witness: I began to cross-examine her.

The Court:—did you not ask for a recess before cross-examining her?

The Witness: I'm not sure, Your Honor. I think at that time I listened to her enough that I felt that there were inconsistencies clear, (sic) and those I wanted to jot down while they were fresh in my mind.

The Court: Weren't you making notes as she was testifying as to those?

The Witness: Yes.

The Court: So weren't they jotted down?

The Witness: They were jotted down for me to ask her questions going in.

The Court: I guess what I'm trying to determine is whether this was some kind of trial strategy that you had in mind for not asking for a recess, and if so, what was the strategy?

The Witness: **No, it wasn't a strategy not to ask for a recess then.** I think at the time it was getting to be able to see her, to hear her, and at that time it didn't—**I didn't even think about let's ask for a recess.**

The Court: When I say a recess, I'm not talking about a day's or two days. I'm talking about fifteen, twenty minutes.

The Witness: I understand.

The Court: Just to read the Grand Jury testimony.

The Witness: **No, it didn't occur to me to ask for that amount of time.** (Sp.26–28) (emphasis added).

On cross-examination of Ms. Scott, counsel for the District Attorney's office attempted to elicit some strategic reason for failing to utilize the grand jury testimony of the complaining witness, Abeline:

Q: Okay. So what you're telling this Court is that you did not get to Abeline's allegations of sodomy which are contained on page thirteen [of the Grand Jury transcript]; is that correct?

A. No, I didn't.

Q: Are you telling this Court that— strike that. You were aware of the charges that were contained in the indictment, correct?

A: Yes, I was.

Q: And those were two counts of rape, two counts of sodomy and one count of endangering the welfare of a child. Am I correct?

A: Yes.

Q: Okay. Now, so you were aware that the defendant was charged with two counts of sodomy?

A: Yes, I was.

Q: Okay. And so at the time that you were listening to Abeline's direct examination, did you—you were aware, weren't you, that she did not testify to any allegations of sodomy? [13]

A: No, she did not.

Q: Okay. And you didn't cross examine her about the fact that she had denied any sodomy, did you?

A: No, I didn't.

Q: And you didn't cross-examine her about that because you figured—

**A: I hadn't that, read that far.**

(Sp.38–39) (emphasis added). The trial strategy that counsel for respondent was attempting to elicit from Ms. Scott would appear to be a reasonable one, *i.e.*, that since no evidence had been elicited from the witness on direct examination about acts of alleged sodomy, it would be foolish to open a Pandora's Box by bringing that subject up on cross-examination. By not questioning on the subject of sodomy, there was no evidence in the record to support those charges and as a result,

---

13. Actually, she denied that any acts of sodomy occurred. Pt–2, p. 26.

Justice Burns dismissed those charges set forth in the indictment. Alas, however, Ms. Scott clearly did not understand this concept, for when this Court asked for clarification on that issue, the lack of strategy or trial tactics on her part became even more evident as reflected in the following colloquy:

The Court: ... Ms. Scott, did you have a specific reason in mind for not asking Abeline about her Grand Jury testimony about the sodomy on cross-examination or did you not ask her about the sodomy because you hadn't read about it yet in the Grand jury minutes?

The Witness: **Because I hadn't read about it yet.**

The Court: **Is that the only reason you didn't ask?**

The Witness: **Yes.**

(Sp.41–42) (emphasis added).

### Other Allegations Of Ineffective Assistance

This Court has read the trial transcript (Pt–2) and finds that the other occurrences that form the additional allegations of ineffective assistance of counsel enumerated by petitioner occurred as follows. Trial counsel:

- offered no expert testimony to refute the prosecution's expert witness;
- failed to object to hearsay testimony by the State's expert witness with respect to statements made to him by the complaining witness;
- failed to object to the hearsay testimony of a rebuttal witness (Ms. Morgan's employer) regarding statements made to him by Ms. Morgan in which he testified that Ms. Morgan asked him to lie for her;
- presented two witnesses who clearly had contradictory stories about wheth-

er or not petitioner was ever alone in the home with the children;

- intimated her own client's guilt by stating (about Ms. Morgan) "she actually believes her mate was not responsible for this act and that's going to remain with her for some time" in her summation; and
- had petitioner testify about his sexual impotence without offering corroborating medical proof.

Whether or not these examples amounted to ineffective assistance of counsel will be addressed in more detail below. Further, in my review of the trial and *Sparman* hearing transcripts, the Court finds the following additional instances relevant to this analysis:

- When counsel questioned Abeline regarding her prior statement to the doctor she essentially accepted her answer when she said she told the doctor "[t]he same thing I told today" (even though that was not the case. (See, Pt–2, pp. 46, 47, 89));
- When asked why she did not tell her regular counselor, with whom she had a very good relationship, about the alleged abuse, Abeline did not answer. The witness told Scott to ask a different question and Scott obliged, never pressing her for an answer (Pt–2, pp. 43 – 45, 50);
- Scott failed to object to any of the testimony of Abeline's paternal grandmother which contained extensive hearsay testimony regarding what she claimed Abeline said to her about the allegations and whether or not she would lie about them (Pt–2, pp. 63 – 65).
- When the inconsistencies in Abeline's statements and testimony became known to her during the course of the trial,[14] Scott did not ask the trial judge

---

14. Ms. Scott testified at the *Sparman* hearing     that she had not read the entirety of Abeline's

for permission to recall the witness to the stand as evidenced by the following colloquy at the *Sparman* hearing:

Q: ... So at least at the time of your summation you would—would it not be a fair statement that you realized at that point that she had, in fact, gone to the Grand Jury on two occasions?

A.: Yes. In fact, I was, I was aware of that at the end of having read through all the material, and again this was something which I tried to note in the—

Q: Did you ask the judge to perhaps recall this witness so you could elicit that testimony about this hiatus between testimony number one and testimony number two in the Grand Jury?

A: No, I didn't.

Q: Why not?

A: Because I felt there was enough inconsistencies in her testimony that we would have later on, and I guess there again, this was a little child who was there, was in and out, and unless it was a momentous thing, I didn't see asking her to come back again.

A: Okay. In retrospect do you think it might have made a difference if you had had the ability to grasp and understand what she had said and when she said it in the Grand Jury when you first started to examine her in your cross-examination?

A: I think we already answered that. Oh, it would have been wonderful. It's like most things that you do. You go back and say, hey, that would have been the better thing to do. (Sp.24–25)

- Scott testified at the *Sparman* hearing that she believed that the trial judge had access to the grand jury transcripts and could use them as he

pleased in the proceedings. (Sp.18, 42)

### Standard of Review

The federal *habeas corpus* statute was amended in 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA). Pub.Law No. 104–132, 110 Stat. 1214. The instant petition was filed on March 22, 2000, and therefore the provisions of the AEDPA and its standard of review apply.

The provisions of the AEDPA have been incorporated into the current *habeas corpus* statute and require a federal *habeas* court assessing a state prisoner's federal claim to give some degree of deference to the findings of the state court in the following manner:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Since petitioner's ineffective assistance of counsel claim was adjudicated on the merits in the state court and such claim implicated clearly established federal law as determined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

grand jury testimony until well after the witness had completed her testimony (Sp.13, 16, 17).

674 (1984), there is no question that the AEDPA standard applies to the instant case. *See Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Sellan v. Kuhlman,* 261 F.3d 303, (2d Cir.2001).

Another section of AEDPA that affords a degree of deference to state court factual findings requires that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

In applying the AEDPA standards to the petition herein, the question to be resolved is as follows:

> Did the adjudication on the merits in the state court proceedings result in a decision that is contrary to clearly established federal law as determined by the Supreme Court of the United States?

■ For the reasons hereinafter set forth, I find that the State court adjudication on the merits of petitioner's claim of ineffective assistance of counsel is contrary to clearly established federal law as set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("the *Strickland* Test"). New York's Court of Appeals has expressly acknowledged that there is a difference between New York's test and the *Strickland* Test in resolving claims of ineffective assitance of counsel as follows:

> In evaluating ineffective assistance of counsel claims, this Court has consistently applied a "flexible" approach (*People v. Benevento,* 91 N.Y.2d 708, 712, 674 N.Y.S.2d 629, 697 N.E.2d 584). "So long as the evidence, the law, and the circumstances of a particular case,

viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation," a defendant's constitutional right to the effective assistance of counsel will have been met (*People v. Baldi,* 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400). Thus, the standard in New York has long been whether the defendant was afforded "meaningful representation" (*see, People v. Benevento, supra,* 91 N.Y.2d, at 712, 674 N.Y.S.2d 629, 697 N.E.2d 584; *People v. Flores,* 84 N.Y.2d 184, 187, 615 N.Y.S.2d 662, 639 N.E.2d 19; *People v. Claudio,* 83 N.Y.2d 76, 79–80, 607 N.Y.S.2d 912, 629 N.E.2d 384, *rearg. dismissed* 88 N.Y.2d 1007, 649 N.Y.S.2d 373, 672 N.E.2d 598). In applying this standard, courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense. The Constitution guarantees a defendant a fair trial, not a perfect one (*Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674). Isolated errors in counsel's representation generally will not rise to the level of ineffectiveness, unless the error is "so serious that defendant did not receive a 'fair trial'" (*People v. Flores, supra,* 84 N.Y.2d, at 188–189, 615 N.Y.S.2d 662, 639 N.E.2d 19).

Despite our well-settled test for evaluating ineffective assistance of counsel claims, the People ask this Court to adopt the Federal standard, maintaining that it is more precise than the State's "meaningful representation" standard.*[footnote omitted]* This Court has previously recognized the differences between the Federal and State tests for ineffectiveness, and has consistently adhered to the application of our "meaningful representation" test (*see, People v. Benevento, supra,* 91 N.Y.2d, at 713–714, 674 N.Y.S.2d 629, 697 N.E.2d 584;

*People v. Claudio, supra,* 83 N.Y.2d, at 79–80, 607 N.Y.S.2d 912, 629 N.E.2d 384). In doing so, we have clarified "meaningful representation" to include a prejudice component which focuses on the "fairness of the process as a whole rather than [any] particular impact on the outcome of the case" (*People v. Benevento, supra,* 91 N.Y.2d, at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584). No further clarification of the standard is required.

*People v. Henry,* 95 N.Y.2d 563, 566, 721 N.Y.S.2d 577, 744 N.E.2d 112 (2000). The New York Court of Appeals has consistently refused to adopt the *Strickland* Test, stating that its test is precise enough to protect against State Constitutional violations. *See id.; People v. Benevento,* 91 N.Y.2d at 715, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998).

On direct appeal, petitioner argued that trial counsel's representation violated his Sixth Amendment[15] right to assistance of counsel. (Dkt. # 5, Ex. B—Appellant's Brief, pp. 7 – 19). Federal law was extensively cited and focused on the argument that the representation fell below the standards set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While the New York State standard of review for ineffective assistance of counsel was stated, it was described as "less exact", and the focus remained on *Strickland* and its progeny.

Petitioner did, however, argue that his circumstances satisfied both the state and federal burdens. *(Id.)*

Although acknowledging that petitioner had a right to effective assistance of counsel pursuant to both the New York State Constitution[16] and the United States Constitution, the People's brief argued only New York law in asserting that petitioner received effective assistance of counsel. (Dkt. # 5, Ex. B—Respondent's Brief, pp. 13 – 14). Likewise, the entirety of the New York State Supreme Court, Appellate Division, Fourth Department comment on this issue rested solely on state law,[17] and is as follows:

> We reject the contention of defendant that he was denied effective assistance of counsel. Defendant failed to demonstrate the absence of a strategic explanation for defense counsel's failure to cross-examine the victim concerning inconsistencies in her Grand Jury and trial testimony (*see, People v. Garcia,* 75 N.Y.2d 973, 974, 556 N.Y.S.2d 505, 555 N.E.2d 902). The evidence, the law and the circumstances of this case, "viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v. Baldi,* 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400).

*People v. Spencer,* 262 A.D.2d 1062, 692 N.Y.S.2d 281 (4th Dep't 1999). The New York State Court of Appeals denied leave

---

**15.** U.S. Const., Amend. VI.:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, *and to have the Assistance of Counsel for his defense.* (emphasis added)

**16.** N.Y. Const. Art. I, § 6 (McKinney's) "In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel. . . ."

**17.** Compare *People v. Aiken,* where differing state and federal standards were discussed and cited throughout with the conclusion that the defendant was afforded effective assistance of counsel pursuant to *both* standards. 45 N.Y.2d 394, 398–401, 408 N.Y.S.2d 444, 380 N.E.2d 272 (1978).

to appeal without comment. *Spencer,* 94 N.Y.2d 829, 702 N.Y.S.2d 600, 724 N.E.2d 392.

■ The Appellate Division decision fails to set forth factual findings on the issue of effective assistance of counsel and therefore, a presumption of correctness is inapplicable. A mere conclusion that the defendant was provided effective assistance of counsel does not constitute a finding of fact for purposes of 28 U.S.C. § 2254(e)(1). *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. As a result, this Court is at liberty to make its own finding of facts and apply the appropriate federal standard in determining whether petitioner was denied effective assistance of counsel at his trial. Admittedly, this Court now has the advantage of having additional facts available to it in making its determination as a result of the *Sparman* hearing conducted on August 28, 2001.

### The *Strickland* Test:

"[I]n adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the [established] principles ... do not establish mechanical rules. Although these principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of the breakdown in the adversarial process that our system counts on to produce just results."

*Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052.

Indeed, this is a heavy burden for the petitioner as evidenced by the Second Circuit Court of Appeals' holding in *Pavel v. Hollins,* 261 F.3d 210 (2d Cir.2001) wherein the Court stated:

To establish that he was convicted in violation of his right to effective assistance of counsel, a claimant must satisfy both prongs of the two part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test is "rigorous," *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001), and "highly demanding," *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To satisfy it, a claimant must show both that "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

As to the first prong, to determine whether an attorney's conduct was deficient, "[t]he court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the *wide* range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (emphasis added). As to the second prong, to establish that he was "prejudiced" by his attorney's constitutionally deficient performance, a claimant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. A "reasonable probability" in this context is one that "undermine[s] confidence in the outcome." *Id.*

*Pavel v. Hollins,* 261 F.3d at 216.

The *Pavel* case is practically on all fours with the case at bar and provides a legal roadmap for the proper analysis and determination to be made regarding the issues herein. *Pavel* involved a claim of sexual abuse perpetrated by the defendant on his two sons who were ages seven (7) and five

(5) at the time. The only witnesses to the alleged abuse were the two boys and the defendant, and there was no substantial circumstantial evidence of abuse. As a result, the case was essentially a "credibility contest."

In the case at bar, the trial before Justice Burns was essentially one of determining the credibility of the complaining witness, Abeline, who was ten (10) years old at the time of the indictment against the defendant and that of the defendant who denied all of the charges against him.

The two cases are further similar in that in both, defense counsel failed to conduct a pretrial investigation and analysis of the People's physical evidence or make use of an expert on behalf of the defendant for purposes of reviewing the People's medical evidence and assisting counsel in her trial preparation in order to discredit that evidence. In both cases, the defense failed to call an expert to refute the medical testimony presented by the prosecution at trial.

## A. Trial Counsel's Performance

As indicated earlier, the People's chief witness at trial was Abeline, a 10–year old with a recorded history of Oppositional Defiant Disorder ("ODD") [18] which included **"lying"** and **"sexual inappropriateness."** This history certainly provided a substantial foundation for attacking her credibility, especially since it was clearly established that she had given at least three (3) different versions of the alleged sexual abuse prior to her trial testimony. Admittedly, cross-examining a child of tender years can be fraught with danger and backlash, if not done with sensitivity. Nevertheless, the inconsistencies of Abeline on the types of alleged sexual abuse were so substantive that they could not be ignored, and a thorough cross-examination on these inconsistencies may very well have changed the outcome of the trial.

An attack on Abeline's credibility could have been further strengthened had trial counsel established just what Oppositional Defiant Disorder was through an expert and further tied such disorder into Abeline's claims of sexual abuse. At a minimum, the use of a child psychologist or similar expert would have been most useful and helpful to trial counsel in preparing for the cross-examination of Dr. Coyne. Ms. Scott failed to ask any questions of Dr. Coyne about Abeline's history of ODD and failed to tie in her history of "lying" and "sexual inappropriateness" with her claims of sexual abuse in questioning Dr. Coyne.

In addition to failing to properly investigate and analyze the psychological issues relating to Abeline as aforesaid, trial counsel also failed to make use of a medical expert with respect to Abeline's physical condition as found and testified to by Dr. Coyne.[19] Dr. Coyne testified in substance that his finding of the cleft or scar on

18. Oppositional Defiant Disorder (ODD) is defined as follows: The essential feature of Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months (Criterion A) and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper (Criterion A1), arguing with adults (Criterion A3), deliberately doing things that will annoy other people (Criterion A4), blaming others for his or her own mistakes or misbehavior (Criterion A5), being touchy or easily annoyed by others (Criterion A6), being angry or resentful (Criterion A7), or being spiteful or vindictive (Criterion A8). AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 91 (4th ed.1994).

19. There is no indication in the record that Ms. Scott had the education or experience necessary to assess relevant physical evidence and to make her own reasonable, informed determination as to whether an expert should be consulted or called to the stand.

Abeline's hymen was consistent with what she had told him. (Pt–2, p. 95).

However, in responding to questions put to him by the trial judge about his findings based on his examination of Abeline, Dr. Coyne admitted that the type of scarring or cleft that he saw on Abeline's hymen could have been brought about by a number of **"outside agents"** causing penetration, *e.g.,* **"pencils, by almost anything you can imagine would do the same thing ... bicycles."** Dr. Coyne could **not** narrow down or rule out other causes for the scarring appearing on Abeline's hymen. (Pt–2, pp. 92, 93). Trial counsel failed to pursue these other causes or possibilities in her cross-examination of Dr. Coyne and appears to have accepted his finding that his assessment was consistent with what Abeline had told him. In essence, the cross-examination of Dr. Coyne by Ms. Scott was perfunctory at best. A defense medical expert could have brought light to causes other than penile penetration for Abeline's scarring or cleft on her hymen. The language of the Second Circuit Court of Appeals in *Lindstadt v. Keane,* 239 F.3d 191 (2d Cir.2001) is most applicable on this particular issue:

> Moreover, there is no evidence that defense counsel contacted an expert, either to testify or (at least) to educate counsel on the vagaries of abuse indiction. *See generally* Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse,* 45 A.F.L.Rev. 261, 270 (1998) ("It is difficult to imagine a child abuse case ... where the defense would not be aided by the assistance of an expert.") Such an expert could have brought to light a contemporaneous study, accepted for publication at the time of Lindstadt's trial, that formed similar irregularities on the hymens of girls who were *not* abused. *See* John McCann, et al., *Genital Findings in Prepubertal Girls Selected for Nonabuse: A Descriptive Study,* 86 Pediatrics, No. 3, at 428–439 (Sept.1990); *see also Townsend,* 45 A.F.L.Rev. at 269–270 (discussing studies that indicate the presence of clefts on the hymen of non-abused girls); J. Gardner, *Descriptive Study of Genital Variation in Healthy, Nonabused Girls,* 120 J. Pediatrics 258–260 (Feb.1992).

> \*     \*     \*     \*     \*     \*

> In sum, defense counsel's failure to consult an expert [and] failure to conduct any relevant research ... contributed significantly to his ineffectiveness.

*Lindstadt,* 239 F.3d at 201–202.

It is abundantly and unequivocally clear to this Court, as a result of the *Sparman* hearing, that trial counsel for the petitioner had no strategic reason whatsoever for not utilizing Abeline's grand jury testimony and prior statements to Dr. Coyne and the social worker in cross-examining Abeline on her claims of sexual abuse. As a result, it can only be concluded that such failure fell "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The credibility of Abeline, or lack thereof, was the focal point in the determination of guilt or innocence of the petitioner. Dr. Coyne's medical conclusion was primarily based on what Abeline told him, and he merely found that the physical evidence was consistent with what she told him. However, he also admitted that this same physical evidence could be the result of penetration by **"other forms ... by pencils, by almost anything you can imagine ... bicycles"** (Pt–2, p. 92) (emphasis added). Not only did Abeline make inconsistent statements of a substantive nature on five separate occasions, to wit, the April 18, 1996 statement to the social worker, the April 30, 1996 statement to Dr. Coyne, her grand jury testimony of November 19, 1996, her grand jury testimony of November 28, 1996 and her testimony on direct

examination at trial, she had a recorded history of "lying," "sexual inappropriateness" and ODD. None of this impeachment ammunition was used by trial counsel to at least attempt to establish that Abeline's testimony on such a crucial issue was unreliable not only for Dr. Coyne's diagnostic conclusion, but for the trial court's determination of guilt or innocence.

Even if the failure of trial counsel to utilize the prior inconsistent statements of Abeline in cross-examination were deemed insufficient for purposes of meeting the first prong of the *Strickland* test, the failure to conduct a pretrial investigation into the People's physical or medical evidence and utilize the services of a medical expert in trial preparation as well as at trial further buttresses this Court's conclusion that petitioner was not provided effective assistance of counsel at his trial. I have assessed the impact of these failures in the aggregate, and the cumulative weight of these deficiencies compels a conclusion that Ms. Scott's representation of petitioner at his criminal trial did not fall within the "wide range" of adequate assistance. *See Strickland*, 466 U.S. at 695–96, 104 S.Ct. 2052; *Lindstadt*, 239 F.3d at 201–202; *Pavel*, 261 F.3d at 216. I therefore conclude that petitioner has met the first prong of the *Strickland* Test.

### B. Prejudice

■ As stated by the United States Supreme Court in *Strickland* and reiterated by the Court of Appeals for the Second Circuit:

> [A]n ineffective assistance of counsel claimant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Pavel*, 261 F.3d at 226.

The criminal trial of the petitioner was a case of underwhelming evidence, consisting basically of the testimony of the complaining witness, Abeline, and the very limited testimony of Dr. Coyne. There were only two people with any direct knowledge as to whether petitioner sexually abused Abeline, the petitioner, who denied such abuse, and Abeline, who gave contradictory accounts of alleged abuse on three different occasions. Her credibility, for the reasons previously outlined herein, was certainly highly suspect. Trial counsel's failure to adequately attack that credibility with the damaging tools that were available to her at the trial constituted a dereliction of substantial magnitude considering the weakness of the People's case. This was compounded by counsel's failure to challenge the limited physical evidence of abuse presented by the testimony of Dr. Coyne as previously described herein.

There is no evidence that trial counsel contacted an expert either to testify or at least to educate her on the vagaries of abuse indicia. Even Dr. Coyne admitted that the scarring or the cleft that he found on Abeline's hymen could have been caused by other outside forces, including a bicycle, but this was not pursued or exploited by trial counsel on cross-examination. Had trial counsel conducted an adequate pretrial investigation of the physical evidence against petitioner and utilized the services of a physician with extensive experience in evaluating and/or treating victims of child abuse, there is a "reasonable probability" that petitioner would not have been convicted of the crimes with which he was charged.

In conclusion, the cumulative effect of trial counsel's deficiencies, as outlined herein, prejudiced the petitioner to the extent that they "undermine confidence in

the outcome" of his trial. As a result, this Court finds that the state judgment of conviction against petitioner Ricky Spencer was entered in violation of his rights under the Sixth Amendment to the United States Constitution. *See Pavel,* 261 F.3d at 216; *Lindstadt,* 239 F.3d at 201–202. Accordingly, the state court judgment of conviction is hereby vacated and petitioner's writ of *habeas corpus* is conditionally granted and petitioner, Ricky Spencer, is to be released from custody 30 days after the filing of this Decision and Order "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" petitioner. *Pavel,* 261 F.3d at 229.

I will continue to exercise jurisdiction over this matter in the event the parties feel the need to seek further judicial intervention, and the Clerk of the Court is directed to refrain from closing this file until further order of the Court.

**SO ORDERED.**